**In the United States District Court for the Eastern District of Virginia**
**Newport News Division**

**United States of America,**

**v.**                                             **Docket No. 4:16-cr-00049**
                                                 **The Hon. Raymond A. Jackson**

**Timeiki Hedspeth.**

### Memorandum in Support of Motion for Compassionate Release

Temeiki Hedspeth, through counsel, respectfully moves this Court for compassionate release under 18 U.S.C. § 3582(c)(1)(A). After serving three years in custody, Ms. Hedspeth's projected release date is November 30, 2029. Based on the combination of the global COVID-19 pandemic and Ms. Hedspeth's chronic health issues, Ms. Hedspeth asks the Court to grant her compassionate release and amend her sentence to time served and ten years' supervised release, the first five to be served on home confinement.

The BOP is holding Ms. Hedspeth in custody at FPC Bryan. The virus thrives in densely packed populations, and like other BOP facilities, FPC Bryan is ill-equipped to contain the pandemic and prevent COVID-19 from spreading to inmates like Ms. Hedspeth. Allowing Ms. Hedspeth to finish out the remainder of her sentence at her mother's home in Houston, Texas protects her from potentially severe illness while maintaining deterrence through the Court's ability to revoke her Supervised Release for any missteps.

Ms. Hedspeth is not a danger to the community, and her release plan adheres to the mandates of Section 3553(a), particularly in light of the concrete dangers of this pandemic.  Ms. Hedspeth respectfully asks the Court to consider this motion on an expedited basis as the risk to Ms. Hedspeth's health will not diminish during the course of the pandemic.

## FACTUAL BACKGROUND

On November 3, 2017, this Court sentenced Ms. Hedspeth to 175 months' incarceration after a jury convicted her of Bank fraud, Mail Fraud, Wire Fraud, and Aggravated Identity Theft. Docs. 170, 229

Ms. Hedspeth has been in custody since June 30, 2019. *See* Exhibit 1, Timeiki Hedspeth Sentence Calculation Worksheet. After three years in custody, her projected release date is November 30, 2029. *Id*. While Ms. Hedspeth's facility has not reported any active COVID-19 cases, the number suggest it is only a matter of time: 60 BOP facilities and 28 residential reentry centers have been affected.[1] As of June 8, BOP 6,650 inmates and staff have tested positive while 79 have died.

At FPC Bryan, Ms. Hedspeth is working regularly and has earned satisfactory work evaluations. *See* Exhibit 2, Timeiki Hedspeth Reentry Plan. She is enrolled in the Blackstone College Paralegal Program and Stratford Career Institute Criminal Justice Program and has completed many other courses including small business management, accounting, and faith-based parenting. *Id*.

---

[1] https://www.bop.gov/coronavirus/.

She has a release plan – living with her mother and immediately looking for work – that will facilitate a successful reentry.

On May 28, Ms. Hedspeth requested that the warden at Fort Dix move for compassionate release on the same grounds as submitted herein. *See* Exhibit 3, Compassionate Release request to FPC Bryan Warden. Because of the urgency of the spread of COVID-19, both nationally and within the federal prison system, Ms. Hedspeth respectfully asks the Court to waive the 30-day waiting period after this submission for the Court to order compassionate release.

## SUMMARY OF ARGUMENT

***First***, the Court should exercise its authority to grant Ms. Hedspeth's Motion for Compassionate Release without requiring full exhaustion or "the lapse of 30 days" from the warden's receipt of Ms. Hedspeth's request. *See* 18 U.S.C. § 3582(c)(1)(A). Courts across the country have waived the 30-day waiting period in response to the unprecedented threat of COVID-19.[2] By enacting the First Step Act of 2018, Congress amended § 3582 to eliminate the BOP as the sole gatekeeper of compassionate release after BOP's documented failure to "properly manage the compassionate release program."[3] Now, a defendant can seek relief directly from a

---

[2] As an alternative to granting immediate relief, the Court may defer ruling on this motion until the end of the 30-day waiting period. Section 3582(c)(1)(A)'s 30-day waiting period does not prevent a defendant from *filing* a motion prior to the expiration of the 30-day waiting period. *See United States v. Gross*, 2020 WL 1862251 (S.D.N.Y. Apr. 13, 2020) (deferring compassionate release grant until 30 days after the warden's receipt of the defendant's request for compassionate release).

[3] Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program*, at 11 (April 2013); *see also* Department of Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population*

sentencing court as early as 30 days after submitting a request to a warden asking for the BOP to file such a motion, or after completing an administrative appeal process, whichever occurs first. However, this 30-day waiting period is a claims processing rule that addresses who files a compassionate release motion: it is not a jurisdictional bar to the Court's exercise of its authority to grant release.

**Second,** this Court should exercise its authority to grant Ms. Hedspeth compassionate release because the COVID-19 pandemic combined with Ms. Hedspeth's unique susceptibility to COVID-19, given his age, diabetes, high blood pressure, and high cholesterol, is an "extraordinary and compelling" reason warranting relief. As long as Ms. Hedspeth remains incarcerated, she faces an unacceptable risk of contracting and dying from COVID-19.

The alarming spread of COVID-19 in BOP facilities confirms that, despite its efforts, BOP cannot safeguard prisoners. Courts have criticized BOP's overall response as "insufficient" given "the number of infections and deaths which have already occurred in federal custodial institutions,"[4] and one court described BOP efforts at FCI Elkton as fighting "a losing battle. A losing battle for staff. A losing battle for inmates." *Wilson v. Williams*, No. 4:20-cv-00794, 2020 WL 1940882, at *1 (N.D. Ohio Apr. 22, 2020).

---

*on the Federal Bureau of Prisons*, at 51 (May 2015) ("Although the BOP has revised its compassionate release policy to expand consideration for early release to aging inmates, which could help mitigate the effects of a growing aging inmate population, few aging inmates have been released under it.").

[4] *United States v. Joling*, No. 6:11-cr-60131-AA, 2020 WL 1903280, at *5 (D. Or. Apr. 17, 2020).

Even in the best circumstances, inmates cannot provide self-care because their incarceration prevents them from following CDC guidance: "People in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning and laundry, avoid frequently touched surfaces, or sanitize their own environment." *United States v. Skelos*, 15-CR-317 (KMW), 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020). There are serious doubts that BOP will be able to adequately care for prisoners as the COVID-19 pandemic continues to unfold.[5] For these reasons, federal courts nationwide have held that COVID-19 constitutes an extraordinary and compelling basis for ordering compassionate release for defendants facing a rapidly growing mortal threat from exposure to the coronavirus in federal prisons

**Third**, the Section 3553(a) factors warrant Ms. Hedspeth's release. Ms. Hedspeth has served approximately three years for her nonviolent crimes. She has used his time in prison to take courses – from small business management to accounting that will help her successfully transition back to life with her family. Finally, she has a release plan that includes the supportive home of her mother and the intention to immediately return to work once that is a possibility.

---

[5] The Inspector General has found widespread medical staffing shortages across BOP facilities that "lower staff morale, increase staff workload, and ultimately can reduce inmates' access to routine medical care." *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, Office of the Inspector General (March 2016), available at https://oig.justice.gov/reports/2016/e1602.pdf.

## ARGUMENT

### I. The Court Has Jurisdiction To Grant Ms. Hedspeth Compassionate Release Without Delay.

In the First Step Act of 2018, Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to allow a defendant to file a motion for relief when she "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, *whichever is earlier*[.]" First Step Act of 2018, § 603(b), Pub. L. 115- 391, 132 Stat. 5194, 5239 (Dec. 21, 2018) (emphasis added). Congress selected this exceptionally short 30-day waiting period in order to expedite defendants' access to the courts and the courts' consideration of compassionate release motions. *See, e.g., United States v. Haney*, 19-cr-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020).

Here, while the 30-day waiting period has not yet passed, this Court should address Ms. Hedspeth's Motion without delay. Section 3582(c)(1)(A)'s 30-day waiting period is a claims processing rule; it is not a jurisdictional bar to the Court's authority to grant compassionate release. Because it is not a jurisdictional bar, and in light of Congress's clear intent to expand and expedite compassionate release, the 30-day waiting period provision is subject to well-recognized exceptions to administrative exhaustion schemes. In particular, the Court should not require a 30-day delay because waiting would be futile and would cause Ms. Hedspeth undue prejudice in light of the threat posed by the rapid spread of the virus in prison populations and Ms. Hedspeth's particular vulnerability to illness from the virus.

A. <u>The 30-day waiting period is not a jurisdictional requirement.</u>

The Court may grant a sentence reduction now because § 3582(c)(1)(A)(i) addresses only the process for filing a motion; it does not restrict the Court's jurisdiction to grant compassionate release. The Supreme Court has "stressed the distinction between jurisdictional prescriptions and non-jurisdictional claim-processing rules, which seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." *Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843, 1849 (2019).[6] To distinguish between the two, a court applies a "readily administrable bright line" standard: it inquires whether Congress has "clearly stated that the rule is jurisdictional." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013) (citation omitted). When Congress does not clearly create a jurisdictional bar, "courts should treat the restriction as nonjurisdictional in character." *Davis*, 139 S. Ct. at 150 (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006)).

Courts apply the "clear statement" bright line standard by "considering the statutory text (if it speaks in 'jurisdictional terms'); the placement of the rule (if it is located in the jurisdiction-granting provision of the statute); and legislative context." *Stewart v. Iancu*, 912 F.3d 693, 699-700 (4th Cir. 2019). All of these considerations establish that the administrative exhaustion provision of 18 U.S.C. §

---

[6] *See also Henderson v. Shinseki*, 562 U.S. 428, 435 (2011) (claims processing rules "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times").

3582(c)(1)(A)(i) functions merely as a claims processing rule, not a jurisdictional requirement.

      i.   <u>The statutory text confirms the 30-day waiting period is not jurisdictional.</u>

The statutory text of § 3582(c)(1)(A does not address the courts' jurisdiction; it merely promotes the "orderly progress of litigation" by stipulating *which party* will file a compassionate release motion, and allows prisoners to move on their own behalf after 30 days from BOP receipt of an inmate's request to file such a motion. "A statutory condition that requires a party to take some action before filing a lawsuit is not automatically 'a *jurisdictional* prerequisite to suit'"; instead, "the jurisdictional analysis must focus on the 'legal character' of the requirement." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010) (emphasis in original); *see also Stewart*, 912 F.3d at 701 ("Simply because [Title VII's] 180-day waiting period is 'cast in mandatory language' does not render it jurisdictional."). And here, the legal character of the 30-day waiting period "simply delineates the process for a party to obtain judicial review, [and does] not refer[] to the adjudicatory capacity of courts." *Haney*, 2020 WL 1821988, at *3 (concluding that "the exhaustion requirement in § 3582(c)(1)(A) is a claim-processing rule that does not deprive this Court of jurisdiction").

      ii.   <u>The placement of the 30-day waiting period confirms it is not jurisdictional.</u>

The "exhaust or wait 30 days" provision is not placed in the jurisdiction-granting provision of the statute; it is in the "part of the chapter dealing generally with sentences of imprisonment." *See United States v. Taylor*, 778 F.3d 667, 671

(7th Cir. 2015). "Tellingly, the word 'jurisdiction' or its variation never appears" in § 3582. *Haney*, 2020 WL 1821988, at *3. Moreover, § 3582 as a whole expressly **confirms** the courts' sentencing modification authority. Though § 3582(c) states that the "court may not modify a term of imprisonment once it has been imposed," that provision follows § 3582(b), which states that "a sentence to imprisonment can subsequently be" modified "pursuant to" certain provisions. In short, § 3582(c)(1)(A) merely sets forth a procedure "pursuant to" which sentence modifications are made; it does not divest or condition the courts' jurisdiction.

### iii. The unique structure and legislative context of the 30-day waiting period confirms it is not jurisdictional.

By enacting the First Step Act, Congress removed the BOP as the sole gatekeeper of compassionate release and expedited defendants' access to the courts. In allowing defendants to seek compassionate release directly from federal courts, Congress implemented a modest procedural hurdle – "either exhaust or wait 30 days" – that "substantially reduces the importance" of protecting BOP authority by allowing "a defendant to come to court before the agency has rendered a final decision." *Haney*, 2020 WL 1821988, at *3.

Moreover, the First Step Act followed the Inspector General's critical assessment of the previous compassionate release framework: "not all [BOP] institutions have timeliness standards, and for those institutions that do, the timeframe ranges from 5 to 65 days"; "the process available to inmates to appeal a Warden's or Regional Director's denial of a compassionate release request can take up to more than 5 months to complete"; and that "BOP cannot determine if requests

are processed in a timely manner because the BOP does not track the time it takes to approve or deny requests."[7]

Congress intended to expand and expedite judicial review of compassionate release motions, and it chose the uniquely short 30-day waiting period to effect that result. Treating the 30-day waiting period as jurisdictional would ignore the statutory structure and thwart these purposes by abdicating the authority that Congress intends the Courts to exercise.

    iv.  <u>Treating the 30-day waiting period as non-jurisdictional is most consistent with Fourth Circuit precedent.</u>

Though the Fourth Circuit has not addressed whether the 30-day waiting period in § 3582(c)(1)(A) is jurisdictional,[8] it has provided instructive guidance in addressing a similar exhaustion provision in Title VII. *See Stewart*, 912 F.3d at 699-704. Section 2000e-16(c) of Title VII allows employees and job applicants to bypass administrative exhaustion of their discrimination claims when a government agency fails to "take final action" within 180 days of filing an initial complaint.

As the Fourth Circuit noted, "[u]nlike most administrative exhaustion requirements premised on agency action . . . the 180-day waiting period is satisfied by agency *inaction*." *Id.* Moreover, "Congress passed Section 2000e-16(c) of Title

---

[7] Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program*, at ii-iii (April 2013).

[8] The Fourth Circuit has held that the implicit prohibition on motions to reconsider a sentence reduction pursuant to § 3582(c)(2) based upon a retroactive amendment to the Sentencing Guidelines is not jurisdictional and may be waived. *See United States v. May*, 855 F.3d 271, 274-75 (4th Cir. 2017) (recognizing a "nonjurisdictional" bar to § 3582(c)(2)-based motions for reconsideration).

VII in 1972 precisely because of its recognition that federal employees frequently encountered an 'administrative quagmire' in filing charges of discrimination." *Id.* at 699. The Fourth Circuit thus concluded that Title VII's 180-day waiting period is "akin to a 'claim-processing' rule that imposes procedural obligations on litigants . . . [and] is not jurisdictional." *Id.* at 701. Because the 30-day waiting period under § 3582(c)(1)(A) is likewise satisfied by agency inaction, and was enacted to counteract prisoners' inability to seek compassionate release, the same reasoning applies here.

### B. Waiver of the 30-day waiting period is consistent with Congressional intent.

This Court may waive the 30-day waiting period if waiver is consistent with Congress's intent as evidenced by the statutory context and purposes. In particular, where "Congress wanted more oversight by the courts," even a statutory exhaustion requirement may be "excused by the courts." *Smith v. Berryhill*, 139 S. Ct. 1765, 1774, 1776 (2019). Here, Congress plainly intended to expand and expedite compassionate release by giving prisoners a direct path to the Courts.

Because it allows complete circumvention of BOP action after the lapse of 30 days, Section 3582's exhaustion provision undercuts the typical purposes of administrative exhaustion: allowing an agency to apply its expertise; preventing premature judicial interference; and compiling an administrative record to aid judicial review. While BOP may recommend cases to the Court, the statutory scheme does not depend on BOP's recommendations, and the Court must ultimately decide whether to grant relief in all cases regardless of BOP's consideration. *United*

11

*States v. Soto*, No. 1:18-cr-10086-IT, 2020 WL 1905323, at *5 (D. Mass. Apr. 17, 2020) ("[A]lthough waiting thirty days may simplify matters for the court where the BOP joins the motion, the waiting period generally will not eliminate the need for judicial involvement."). The provision thus "does not reflect unqualified commitment to administrative exhaustion," to the contrary, it "reflect[s] acknowledgement that the judiciary has an independent interest in, and responsibility for, the criminal judgments it is charged with imposing." *United States v. Russo*, 16-cr-441 (LJL), 2020 WL 1862294, at *6 (S.D.N.Y. Apr. 14, 2020) (emphasis added).

Congress could not predict the unprecedented threat that prisoners face from COVID-19, but the 30-day waiting period was designed to prevent inequitable results where BOP's many demands prevent it from promptly considering compassionate release requests. Given "the multiple demands that the BOP has faced for many years in this era of mass incarceration [the Court] can reasonably infer that Congress recognized that there would be many cases where the BOP either could not act within 30 days on such a request or, even if it did act, its review would be superficial." *Haney*, 2020 WL 1821988, at *3. The statutory text reflects that "Congress was determined not to let such exigencies interfere with the right of a defendant to be heard." *Id.* "In essence, the 30-day rule was meant as an accelerant to judicial review . . . . and it would pervert congressional intent to treat it as a substantial obstacle to effective judicial review." *United States v. Russo*, No. 16-cr-441 (LJL), ECF No. 54, at 5 (S.D.N.Y. Apr. 3, 2020); *United States v. Atwi*, No.

18-20607, 2020 WL 1910152, at *3 (E.D. Mich. Apr. 20, 2020) ("Congress contemplated that a defendant would be able to seek court redress quickly. But 30 days when the statute was passed and 30 days in the world of COVID-19 are very different."). Accordingly, when "BOP has not been able to satisfy its obligation to act expeditiously . . . or to assure the Court it can do so . . . the Court can exercise the power Congress has given it" in the extraordinary circumstances of COVID-19. *Russo*, 2020 WL 1862294, at *7.[9]

The statute's plain text—both its distinctive structure and its title—therefore supports application of equitable exceptions.

C. <u>The Court should waive exhaustion because Ms. Hedspeth is at grave risk of contracting a fatal disease and pursuing administrative remedies would be futile and unduly prejudicial.</u>

Because the § 3582(c)(1)(A) waiting period is non-jurisdictional, the Court may excuse Ms. Hedspeth's failure to exhaust his administrative remedies if: (1) exhaustion would be futile; (2) the administrative process is incapable of granting adequate relief; or (3) pursuing agency review would subject Ms. Hedspeth to undue prejudice. *See, e.g., Orr v. Assurant Employee Benefits*, 786 F.3d 596, 602

---

[9] S*ee also United States v. Scparta*, No. 18-cr-578 (AJN), 2020 WL 1910481, at *7 (S.D.N.Y. Apr. 20, 2020) ("In short, a strict application of the statute's exhaustion requirement would foreclose judicial review for inmates like Ms. Scparta, therefore posing risk to prisoners, guards, and the public—the opposite of the First Step Act's legislative purpose."); *cf. Gonzalez v. Thaler*, 565 U.S. 134 (2012) ("Treating § 2253(c)(3) as jurisdictional also would thwart Congress' intent in AEDPA to eliminate delays in the federal habeas review process.") (quotation omitted); *Stewart*, 912 F.3d at 703 ("Our conclusion also comports with the broader purpose of Title VII as a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process.").

(7th Cir. 2015).[10] As this Court recently held, "[t]he COVID-19 pandemic, which could result in catastrophic health consequences for petitioners vulnerable to infection, implicates all three exceptions justifying the waiver of the exhaustion requirement." *United States v. Poulios*, No. 2:09-cr-00109-RAJ-TEM, 2020 WL 1922775, at *1 (E.D. Va. Apr. 21, 2020).

Indeed, given COVID-19's unprecedented and unique threat to people confined to prisons, courts throughout the country have applied these well-recognized exceptions in waiving exhaustion under § 3582(c)(1)(A). *See, e.g.*, *Haney*, 2020 WL 1821988, at *4 ("Congressional intent not only permits judicial waiver of the 30-day exhaustion period, but also, in the current extreme circumstances, actually ***favors*** such waiver, allowing courts to deal with the emergency before it is potentially too late.") (emphasis added); *United States v. Jones*, No. 3:11-cr-249, Dkt. No. 47 (E.D. Va. Apr. 3, 2020) ("Given Jones's unique circumstances and the exigency of a rapidly advancing pandemic, requiring Jones to exhaust administrative remedies would result in undue prejudice and render exhaustion of the full Bureau of Prisons administrative process both futile and inadequate.").[11]

---

[10] *See also Garza v. Davis*, 596 F.3d 1198, 1203-04 (10th Cir. 2010) (recognizing futility exception in context of § 2241 petition);

[11] *See also United States v. Sawicz*, 08-cr-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020) ("The delay that the defendant would experience if he had to wait for thirty days to expire before pursuing a motion for compassionate release in this court would put him at significant risk of suffering catastrophic health consequences."); *United States v. Colvin*, No. 19-cr-179, 2020 WL 1613943, at * 2 (D. Conn. Apr. 2, 2020) (requiring exhaustion would subject defendant to "undue prejudice – the heightened risk of severe illness – while attempting to exhaust her appeals"); *United States v. McCarthy*, No. 3:17-CR-0230, 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (waiving exhaustion where defendant's "age and underlying

i. <u>Futility</u>

Pursuing administrative remedies would be futile in this case because BOP

has presumptively deemed Ms. Hedspeth ineligible for relief.  BOP represents that,

on March 26, it "began immediately reviewing all inmates who have COVID-19 risk

factors . . . to determine which inmates are suitable for home confinement."[12]

Because BOP has not identified Ms. Hedspeth for early release or home

confinement, and because BOP has made no representation that it intends to grant

Ms. Hedspeth's request, the Court can find that BOP has deemed Ms. Hedspeth

unsuitable for home confinement or early release.  Accordingly, it would be futile for

Ms. Hedspeth to pursue her administrative remedies.[13]

ii. <u>Inadequate relief</u>

Second, any relief that could be granted through the administrative process

would be inadequate because it would require Ms. Hedspeth to suffer irreparable

---

health issues, when considered in light of the spread of COVID-19, demonstrate that
further delay could likely result in such catastrophic health consequences, including
death"); *United States v. Zukerman*, 16 CR 194, 2020 WL 1659880, at *4 (S.D.N.Y.
Apr. 3, 2020) (Defendant's "advanced age and compromised health, combined with
the high risk of contracting COVID-19 at Otisville, justify waiver of the exhaustion
requirement."); *United States v. Perez*, No. 17-cr-513-3, 2020 WL 1546422, at *1
(S.D.N.Y. Apr 1, 2020) (Defendant's "exhaustion of the administrative process [under
the First Step Act] can be waived in light of the extraordinary threat posed – in his
unique circumstances – by the COVID-19 pandemic.").

[12] Fed. Bur. of Prisons, COVID-19 Home Confinement Information, available
at https://www.bop.gov/coronavirus/

[13] *Cf. United States v. Chatelain*, No. 1:19-cr-133, Dkt. No. 73 (E.D. Va. May
1, 2020) (requiring defendant to appeal or wait 30 days "would be futile and
inadequate and would subject [defendant] to undue prejudice" where BOP issued a
pro forma denial of defendant's compassionate release request).

harm – the ongoing, lethal threat of COVID-19. BOP typically takes months to address inmate requests for compassionate release even under better conditions.[14] Given the pandemic, the system is undoubtedly overwhelmed, further delaying the process, and exposing Ms. Hedspeth to an increasing risk of infection, serious illness, and even death. That risk is an irreparable harm that renders relief inadequate. *See, e.g., United States v. Gileno*, No. 3:19-cr-161-(VAB)-1, 2020 WL 1916773 (D. Conn. Apr. 20, 2020) ("An unyielding view of the exhaustion requirement is likely to render the BOP incapable of granting adequate relief . . . .").

### iii. <u>Undue prejudice</u>

Finally, forcing Ms. Hedspeth to exhaust her administrative remedies will be unduly prejudicial. Ms. Hedspeth's health is negatively impacted by the outbreak even though she has not yet been infected: The conditions at BOP prejudice Ms. Hedspeth's ability to follow the CDC's hygiene and social distancing recommendations, which prejudices her ability to avoid infection, in an environment extremely conducive to spread. Most significantly, Ms. Hedspeth could become extremely ill (or worse), a prejudice that is plainly undue. *See Poulios*, 2020 WL 1922775, at *3 ("[P]reservation of the exhaustion requirement could subject Petitioner to severe illness and death if he contracts COVID-19 because of his underlying health conditions."); *United States v. Love*, No. 1:14-cr-4-1, Dkt. No. 41

---

[14] See BOP Report on Compassionate Release, at ¶G (showing that nonterminal-illness compassionate release requests took on average between 58 and 117 days to be addressed by the BOP).

(W.D. Mich. Apr. 21, 2020) ("[A] 30-day delay would likely cause catastrophic health effects. Such a consequence would be unduly prejudicial.").

This is no idle concern—inmates are catching the virus and dying while these motions are litigated.  On April 1st, a district court in Northern Florida commuted a life sentence for a defendant named Andre Williams to time-served with 12-months home confinement, finding age and medical conditions created significant risk of "life threatening illness should he be exposed to COVID-19 while incarcerated." *United States v. Williams*, No. 04-cr-95, Dkt. No. 91 at *7 (N.D. Fla. Apr. 1, 2020). Before the order granting release was filed, Ms. Williams caught coronavirus in FMC Butner.  He died April 12th.[15]  There is no time to lose.  In these dire circumstances, the Court should waive the 30-day waiting period.

II.   **The COVID-19 Pandemic Presents an Extraordinary and Compelling Reason for Ms. Hedspeth's Compassionate Release Due to Particular Vulnerability.**

A.   This Court can determine that COVID-19 presents an extraordinary and compelling reason for compassionate release.

Under Section 3582(c)(1)(A)(i), this Court "may reduce the term of imprisonment" if it finds that "extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]"  The Sentencing Commission has issued a policy statement that provides factual considerations for determining whether compassionate release is appropriate.  Those considerations include three

---

[15] *See* Bur. of Prisons, *Inmate Locator* (available at: https://bit.ly/2XDfgZe) (a search shows inmate Andre Williams died April 12, 2020).

enumerated categories of "reasons" – relating to defendant's medical condition, age, and family circumstances – as well as a "catchall" provision: any "other reasons" as determined by the BOP.  U.S.S.G. § 1B1.13, Application Note 1(A).[16]  However, this policy statement is outdated[17] and inconsistent with the First Step Act to the extent it provides that only the BOP may determine what "other reasons" qualify as "extraordinary and compelling."[18]

It is the Courts' role to determine what "other reasons" warrant compassionate release, notwithstanding the Commission's outdated policy

---

[16] Additionally, the commentary makes clear that the extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment."  U.S.S.G. § 1B1.13, Application Note 2.  In other words, even if an "extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court, [that fact] does not preclude consideration for a [sentence] reduction."  *Id.*

[17] Since the passage of the First Step Act, there have not been enough commissioners to update the Commission's policies or amend the Sentencing Guidelines. *See United States v. Brown*, No. 4:05-CR-00227-1, 2019 WL 4942051 at *2 n.1 (S.D. Iowa Oct. 8, 2019) ("As district courts have noted often this year, the Sentencing Commission has not amended the Guidelines following the First Step Act and cannot do so until it again has four voting commissioners.").

[18] *See United States v. Perdigao*, No. 07-103, 2020 WL 1672322, at *2 (E.D. La. Apr. 2, 2020) ("Many courts have concluded that . . . the Sentencing Commission does not have a policy position applicable to motions for compassionate release filed by defendants pursuant to the First Step Act."; *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 WL 1627331,  at *1 (E.D. Pa. Apr. 1, 2020) (""the scope of the old policy statement is clearly outdated and, at the very least, does not apply to the entire field of post-First Step Act motions . . . . Therefore, the policy statement may provide 'helpful guidance' but does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i).""); *United States v. Cantu-Rivera*, No. H-89-204, 2019 WL 2578272, at *2 n.1 (S.D. Tex. June 24, 2019) ("Because the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect." (internal citation omitted).

statement that provided for BOP to make that determination. *See United States v. Maumau,* 2:08-cr-758-TC, 2020 WL 806121, at *7-8 (D. Utah Feb. 18, 2020). Numerous courts have recognized the judicial authority to find that compassionate release is warranted for "other reasons" than those set forth in U.S.S.G. § 1B1.13. *See, e.g., United States v. Poulios,* No. 2:09-cr-00109-RAJ-TEM, 2020 WL 1922775, at *2 (E.D. Va. Apr. 21, 2020) ("[T]he court may consider a combination of factors including but not limited to those listed in Application Note 1 in evaluating a petitioner's request for a sentence modification under the 'catch-all' provision."); *United States v. Redd,* Case No. 1:97-cr-00006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020) ("[T]he Court joins other courts in concluding that a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1 (A)-(C)").

There is ample precedent to support compassionate release in light of prisoners' particular susceptibility and vulnerability to COVID-19. Courts in the Fourth Circuit and across the country have found that a defendant's heightened risk and particular vulnerability to COVID-19 in prison constitutes an "extraordinary and compelling reason" in favor of compassionate release.[19]

---

[19] *See, e.g., United States v. Poulios,* No. 2:09-cr-00109-RAJ-TEM, 2020 WL 1922775, at *3 (E.D. Va. Apr. 21, 2020) (finding "extraordinary and compelling reasons to modify [defendant's] sentence because of the great risk that COVID-19 poses to a person of [defendant's] age with underlying health conditions"); *Dinning v. United States,* No. 2:12-cr-84, 2020 WL 1889361, at *2 (E.D. Va. Apr. 16, 2020) ("[T]he confluence of petitioner's medical conditions and the COVID-19 pandemic may constitute an extraordinary and compelling reason for sentence modification . . . .");

B. **Ms. Hedspeth is particularly susceptible to contracting COVID-19 because of her conditions of confinement.**

Where Courts have heard testimony on BOP's response to COVID-19, they have expressed serious concerns:

> However, if McCall's case is an example of the BOP's management of COVID-19, there are additional explanations for the explosion of cases at [FCI Forrest City Low]. Though McCall's COVID-19 diagnosis was entered into the medical staff's records on May 17, he remained in his general population dorm until May 20. BOP physicians Dr. Obi and Dr. Kapur appeared unconcerned about this delay despite both doctors' acknowledgment that even asymptomatic COVID-19 patients are contagious.

*United States v. McCall, No. 2:18CR95-MHT, 2020 WL 2992197, at \*6 (M.D. Ala. June 4, 2020).*

> In fact, the BOP has no plans for a follow-up appointment with a physician for McCall until his next chronic care appointment in February 2021. The monitoring of McCall's condition consists of daily rounds by medical staff who check only the temperatures of approximately 155 inmates in his dorm. …The court finds the BOP's plan to monitor McCall's unique and precarious condition--which is essentially no plan at all--gravely inadequate.

*Id.* at \*5-6.

---

*United States v. Jones*, No. 3:11-cr-249 (E.D. Va. Apr. 3, 2020) (granting compassionate release and converting remainder of sentence to home confinement in light of "the current public health crisis caused by COVID-19"); *United States v. Edwards*, No. 6:17-cr-3-NKM, 2020 WL 1650406, at \*6 (W.D. Va. Apr. 2, 2020) (granting compassionate release); *United States v. Collins*, No. CCB-10-336, 2020 WL 1506176 (D. Md. Mar. 30, 2020) (granting compassionate release to a "non-violent drug offender who has already served a lengthy sentence" even though "it has not been proffered that [defendant] has an underlying health condition which makes him more susceptible to the effects of the virus, and while the risks posed by a defendant's continued residence in a detention facility do not necessarily mandate release"); *United States v. Copeland*, Case No. 2:05-CR-135-DCN (D.S.C. Mar. 24, 2020) (granting compassionate release in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments defendant has during this current pandemic").

The Court is certainly aware of the swift spread of COVID-19 in BOP

facilities  As of June 5, 2020, the Bureau of Prisons reported that 5,766 inmates

and 633 staff members have tested positive for COVID-19.[20]

Conditions of confinement create the ideal environment for the transmission

of contagious disease[21]: Marion Correctional Institution reported that 81% of its

population (2,011 inmates) have tested positive, and Pickaway Correctional

Institution reported 77% (1,536 inmates) have tested positive.[22]  "Prisons are petri

dishes for contagious respiratory illnesses."[23]  According to public health experts,

incarcerated individuals "are at special risk of infection, given their living

situations," and "may also be less able to participate in proactive measures to keep

themselves safe;" "infection control is challenging in these settings."[24]

Courts across the country have found that prisoners are at grave risk.  "Even

in the best run prisons, officials might find it difficult if not impossible to follow the

---

[20] *See* Fed. Bur. of Prisons, COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/ (includes recovered cases).

[21] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, at https://doi.org/10.1086/521910.

[22] Catherine Candisky, "Coronavirus surges at Pickaway prison, now No. 2 hot spot in nation – behind Marion prison," *The Columbia Dispatch* (Apr. 23, 2020), available at https://www.dispatch.com/news/20200422/coronavirus-surges-at-pickaway-prison-now-no-2-hot-spot-in-nation---behind-marion-prison.

[23] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

[24] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

CDC's guidelines for preventing the spread of the virus among inmates and staff: practicing fastidious hygiene and keeping a distance of at least six feet from others." *United States v. Esparza*, No. 1:07-cr-00294-BLW, 2020 WL 1696084 (D. Idaho. Apr. 7, 2020). Unfortunately, BOP's efforts have not protected inmates.[25]

Courts across the country have recognized the risk to inmates even where facility has not *yet* reported a case of COVID-19. *United States v. Feucht*, Case No. 11-cr-60025, Dkt. No. 53 (S.D. Fla. May 28, 2020) (granting compassionate release despite no confirmed cases at FCI Jessup because "[z]ero confirmed cases is not the same thing as zero COVID-19 cases" (citation omitted)); *United States v. Atkinson*, No. 2:19-CR-55 JCM (CWH), 2020 WL 1904585, **2-4 (D. Nev. Apr. 17, 2020)( granting compassionate release to defendant Atkinson, notwithstanding that FCP Atwater where he was housed had seen no cases of COVID-19 because the realities of prison life make it impossible for medically vulnerable inmates like Mr. Atkinson to follow CDC guidelines to protect themselves in the face of COVID-19); *United States v. Amarrah*, 2020 WL 2220008 (E.D. Mich. May 7, 2020) (releasing medically vulnerable inmate from FCI Loretto, despite no reported COVID-19 cases at the

---

[25] *See, e.g., United States v. Atwi*, No. 18-20607, 2020 WL 1910152, at *4 (E.D. Mich. Apr. 20, 2020) ("Positive cases among federal prisoners continue to rise, and it does not appear that preventative measures are sufficiently working yet to flatten the curve in BOP facilities."); *United States v. Razzouk*, No. 11-CR-430 (ARR), Dkt. No. 136 at 8 (E.D.N.Y. Apr. 19, 2020) (BOP's efforts at FCI Otisville "did not protect [defendant] from exposure to the disease in the first instance, despite his vulnerable status"). *United States v. Muniz*, Case No. 4:09-cr-199, 2020 WL 1540325, at *1 (S.D. Tex. Mar. 30, 2020) ("[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers . . . demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection.").

facility, because he could not adequately protect himself in line with CDC guideline); *United States v. Ben-Yhwh*, No. CR 15-00830 LEK, 2020 WL 1874125 (D. Haw. Apr. 13, 2020); *United States v. Asaro*, No. 17-CR-127 (ARR), 2020 WL 1899221 (E.D.N.Y. April 17, 2020) ("absent more information about how much testing the BOP is conducting, it is possible that undetected cases are present in the facility"); *United States v. Burrill*, No. 17-CR-00491-RS-1, 2020 WL 1846788, at *4 (N.D. Cal., April 10, 2020) ("Prison conditions mean incarcerated individuals, as well as society as a whole, are safer the more defendants are released.").

    C.  <u>Ms. Hedspeth has chronic health conditions.</u>

Ms. Hedspeth has a number of chronic conditions, as detailed in Exhibit 4, 2019 BOP List of Health Problems for Timeiki Hedspeth. The Centers for Disease Control states that "[p]eople with weakened immune systems are at higher risk of getting severely sick from SARS-CoV-2, the virus that causes COVID-19."[26] If she were to contract COVID-19, her body would be fighting illness on several fronts. The safest course for Ms. Hedspeth would certainly to be released on home confinement to self-quarantine and continue treatment for existing conditions.

**III.    Releasing Ms. Hedspeth is appropriate given Ms. Hedspeth's history and characteristics and her rehabilitation while incarcerated.**

---

[26] Centers for Disease Control, *If You Are Immunocompromised, Protect Yourself From COVID-19* (May 14, 2020) available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/immunocompromised.html.

Ms. Hedspeth is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g), and the relevant 18 U.S.C. § 3553(a) factors – specifically her work history, continuing education, and low pattern risk level – favor a sentence reduction.

A. <u>Ms. Hedspeth is not a danger.</u>

Ms. Hedspeth is an ideal candidate for release. According to BOP's own calculations – and based on her commitment to her work and programs – Ms. Hedspeth has earned a minimum security level. *See* Exhibit 2. Ms. Hedspeth is a 42 year old, non-violent offender. She has a minimal disciplinary and "is not considered a management concern." *Id.*

Indeed, by reducing the potential spread of COVID-19 within the prison system, Ms. Hedspeth's release would benefit public safety. *See, e.g., United States v. Harris*, No. 19-cr-356, 2020 WL 1482342, at *1 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions.").[27] Ms.

---

[27] *See also United States v. Davis*, No. 1:20-cr-9-ELH, 2020 WL 1529158, at *4 (D. Md. Mar. 30, 2020) ("If released, Davis will be removed from a custodial setting where the risk of infection is higher for everyone, including the healthy, and he will live in the community where he is able to practice social distancing, self-quarantine, self-isolate if infected, and seek medical treatment if necessary."); *United States v. Mclean,* No. 19-cr-380, Dkt. No. 21 (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Jaffee*, No. 19-cr-88, Minute Order

Hedspeth's release would also reduce the existing strain on BOP's healthcare facilities.[28]

Finally, Ms. Hedspeth's release plan is anchored by her preparation and her connections to her community. If released, she would return to her mother's home to serve confinement and, with the Court's permission, begin looking for work. She has maintained close ties with her mother throughout her incarceration, and her mother has been actively in touch with counsel about a release plan. Moreoever, Ms. Hedspeth's coursework in accounting and business management will help prepare for her work when she is released. Backed by her mother's support and her own diligence while in custody, there is no reason to believe Ms. Hedspeth would present a danger to society.

B. The § 3553(a) factors and Ms. Hedspeth's rehabilitation weigh in favor of relief.

While in custody, Ms. Hedspeth has focused on giving herself every opportunity to succeed upon reentry. She has maintained regular work, where her supervisors have given her satisfactory or better evaluations. *See* Exhibit 2. She has also focused her extracurricular time on courses that will help her find work

---

(D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement").

[28] *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, Office of the Inspector General (March 2016), available at https://oig.justice.gov /reports/2016/e1602.pdf (detailing BOP's medical staff shortages).

(Entrepreneurship, Starting a Small Business, Small Business Management, Principals of Marketing, Introduction to Accounting, Computerized Accounting, Basic Math Problem Solving, Organizational Behavior, Advanced Communications) and maintain healthy habits (Faith-Based Parenting and Budgeting).

    C. <u>Ms. Hedspeth has a viable release plan.</u>

Each day in custody is increasingly risky for Ms. Hedspeth, who has no way to practice "social distancing" or other protectives measures that are mandated by health officials throughout the nation and which promise some hope of surviving the consequences of infection. If released, Ms. Hedspeth will return to her mother's home in Houston, Texas, where she can self-quarantine for 14 days. Once the risk of severe illness has passed, she can bring the skills she has learned through the Bureau of Prisons to the job market, and if healthcare is not available through her employer, the Federal Defenders will assist her in enrolling in a health insurance plan.

## CONCLUSION

Ms. Hedspeth respectfully requests that this Court order her immediate compassionate release and resentence her to time served with ten years of supervised release, the first five to be served on home confinement.

In the alternative, Ms. Hedspeth respectfully requests that the Court issue a non-binding recommendation that BOP transfer Ms. Hedspeth to home confinement for the maximum period permissible, pursuant to the Coronavirus Aid, Relief, and

Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020), 18 U.S.C. § 3624(c)(2), the Second Chance Act of 2007, and 18 U.S.C. § 3621.[29]

Respectfully submitted,

_____/s/_____

Timeiki Hedspeth

By Counsel,

_____/s/_____

Nathaniel Wenstrup
Admitted *Pro Hac Vice*
Assistant Federal Public Defender
Counsel for the Defendant
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
703-600-0825
703-600-0880 (fax)
Nate_Wenstrup@fd.org

---

[29] While BOP has sole authority to determine whether Ms. Hedspeth is suitable for transfer to home confinement pursuant to Section 3624, this Court has the power to make a recommendation, and the BOP is required to consider a sentencing court's recommendation as to where a prisoner should serve his sentence. 18 U.S.C. § 3621(b)(4). Such a recommendation is not part of the sentence subject to appeal. *United States v. Smith*, 733 Fed. Appx 86, 88 (4th Cir. 2018), citing *United States v. Ceballos*, 671 F.3d 852, 856 (9th Cir. 2011) (citing other circuits finding the same). Accordingly, sentencing courts may make these "nonbinding recommendations to the Bureau of Prisons at any time." *Ceballos*, 671 F.3d at 856 n.2.